UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

      Plaintiff,                    Case No. 23-cr-20022

vs.                                 Hon. Gershwin A. Drain

D-1 Mohamad Kazkaz,
D-2 Ziad Khalel,

      Defendants.

## UNITED STATES' SUPPLEMENTAL BRIEF IN OPPOSITION TO THE EMERGENCY MOTION TO MODIFY THE RESTRAINING ORDER

The United States asks the Court to deny the Emergency Motion for the reasons stated in its prior Opposition, and in this Supplemental Brief.

Both the law and the facts point to denying the Motion. On the law, "irreparable harm" is not a basis for overruling 21 U.S.C. § 853(k), though Due Process concerns may, in certain circuits as detailed below. But this situation does not satisfy the *Matthews v. Eldridge* factors so as to justify a fact hearing. The Government has carefully traced the

1

restrained funds to bank accounts and placed holds on those accounts in the exact amounts traceable thereto.  Meanwhile, the Restaurant Chain has continued to spend the restrained funds—in defiance of the Restraining Order—even after filing its Emergency Motion.  When confronted over this, their story about what happened to the $1.445 million completely changed.

The best approach here is to allow the Government to complete its independent tracing of the $1.445 million, seize those restrained funds still in the Restaurant Chain's possession, and <u>then</u> release the holds.  Releasing the holds prematurely would risk Restaurant Chain continuing to spend laundered funds, placing them permanently beyond recovery.

<u>**Fact Update**</u>

This section will focus on the facts that occurred *after* the April 11th motion hearing.

**A. Ongoing Investigation**

On April 12, 2023, the Restaurant Chain was required to produce documents to the Government.  That production is ongoing and has not been completed as of April 25, 2023.

On April 14th, CEO of National Restaurant Chain Tamer Afr met with the Government—along with his attorneys—to provide more detail about the Kazkaz transactions and seek a resolution of the situation. Mr. Tamer Afr continued to contend that the funds had already been spent, and claimed that the Kazkaz funds went to a specific project (a pizza room).

The Court may remember that in communications with the Government and this Court, the Restaurant Chain admitted receiving the $1.445 million, but repeatedly claimed that "those funds were spent on restaurant equipment and fixtures before Third Party had notice of this Court's order."  ECF 29 at PageID.117.  The Chain submitted a list of transactions that supposedly spent the funds, ECF 29 at PageID.179, along with checks and invoices to prove that the transactions occurred. One of the largest checks was for $426,235.60 ("$426K Check"), another was for $191,434.00 ("$191K Check"), and the Chain relied on this as

evidence for its arguments to the Court that holds should be lifted from two of its accounts.  ECF 29 at PageID 175-178.

But that money had not been spent. Yet.

## B. Attempts to Stop Payment on Unspent Funds

The Government realized that the two large checks were not yet cashed, and on April 18, 2023 (1) asked Chase to stop payment on those checks, and (2) asked Restaurant Chain to do the same, on the basis of the Restaurant Chain's position that these funds were subject to the Restraining Order.  In extraordinary caution, the Government honored the Restaurant Chain's request of April 14th to not contact vendors, and did not contact the check payee to inform them of the Restraining Order.

On April 19, 2023, the Restaurant Chain responded, indicating that they had attempted to stop payment on both checks, but the $426K check had been cashed "prior to the hold being placed."  Chase put a hold on the account where the $191K Check was drawn, effectively stopping payment for that check.

## C. The Restaurant Chain Spent Restrained Funds

4

Upon learning that the $426K Check was now cashed, that same day—April 19, 2023—federal agents served the Restraining Order on the vendor who cashed the $426K Check.  Agents spoke to the vendor, who stated that **Tom Jablonski—the vice-president of Restaurant Chain, according to its website—had physically delivered the $426K Check to the vendor on April 18, 2023.**

When confronted with this fact, Restaurant Chain back-pedaled. They admitted that they delivered the check, and did not deny the April 18th delivery date.  But reversing their position that they had maintained for weeks, on April 20, 2023 they claimed (it seems) that the $426K Check was not restrained funds.  The Restaurant Chain's full email explanation is copied into the footnote below.[1]

---

[1] This is Restaurant Chain's April 20th response to the Government's email confronting them with their flagrant violation of the Restraining Order: "[T]here is a difference between the Fund Allocation and a Cash Trail. When my client became aware of the Post-Indictment Restraining Order and the request for the allocation of the funds, the accounting general ledger was used to determine the allocation of construction & equipment. The Cash Trail is separate and combined with funds unrelated to Kazkaz. The bank statements were provided to show the separate accounts the money was moved to (Cash Trail), not only to pay for construction & equipment included in the Fund Allocation, but also general business expenses.

5

Since that time, the Government has independently confirmed—without reliance on Restaurant Chain's claims—that *at least* $333,000 in restrained funds are traceable to the account where the $426K Check was drawn.

To date, Restaurant Chain has not voluntarily[2] deposited any restrained funds with the Marshals, including any funds that *they* claim are subject to the Restraining Order.

Through some combination of unwillingness to obey the Order, or not understanding it, Restaurant Chain is not complying with the Post-Indictment Restraining Order.  They are not depositing funds with the Marshals, and have actively spent funds that they claim are restrained.

---

The check at issue was dated & printed on 02/24/23, then provided to a staff member in charge of the construction. Due to issues during the inspection, the staff member held the check until the inspection issues were resolved. This staff member was not aware of any issues with the Client's bank accounts. Once accounting was notified that the inspection issues were resolved, money (not received from Kazkaz) was transferred to cover the check."

[2] The only funds deposited with the Marshals were delivered by Chase Bank in the amount of $67,344.93, drawn from the initial account where Restaurant Chain deposited the $1.445 million from Kazkaz.

6

This risks irreparably placing victim funds beyond the reach of forfeiture.

### D. New Tailored Holds, Based on Independent FBI Tracing

The Court will recall that Chase Bank placed two holds on April 7th (the subject of this Emergency Motion), simply based on the FBI serving it with the Restraining Order. When the Government asked for Chase to stop payment on the $426K Check and the $191K check, Chase Bank then placed holds on those two additional accounts as of April 19, 2023.

On April 21, 2023, the Government for the first time *requested* that Chase Bank place holds.

Based on its own analysis of the bank records, independent of the Restaurant Chain's claims, the FBI traced the $1.445 million in restrained funds to the following accounts:

- $200,000 to Chase Account ending in 6185, owned by Mostafa Afr.

- $20,000 to Chase Account ending in 3036, owned by [Restaurant Chain] Advertising & Production Fund, Inc.

- $29,300 was traced to Chase Account ending in 7935, of Unknown Ownership.

7

- $333,000 to Chase Account ending in 0811, owned by [Restaurant Chain] Food Group, LLC.

- $405,000 to Chase Account ending in 7893, in the name of [Restaurant Chain] Group, LLC.

The Government requested holds in these precise amounts, and Chase complied.

As of April 22, 2023 (the last communication from Chase), the following amounts are frozen.

| Account Number | Amount of Hold | Present Balance |
|---|---|---|
| 1. 7885 | $1,445,000.00 | $48,353.93 |
| 2. 0852 | $1,445,000.00 | $0.00 |
| 3. 0811 | $333,000.00 | $59,769.18 |
| **4. 0823** | **$1,445,000.00** | **$193,262.29** |
| **5. 6185** | **$200,000.00** | **$13,234.33** |
| 6. 3036 | $20,000.00 | $19,027.65 |
| 7. 7935 | $29,300.00 | $29,300.00 |
| 8. 7893 | $405,000.00 | $0.00 |
| Total Held | | $362,947.38 |

With regard to these holds, a few key facts are worth noting.

(1) The holds of $1.445 million were placed by Chase. The lesser holds were requested by the Government, in the precise amount of restrained funds traceable to the account. In fact, the Government

asked Chase to *reduce* the $1.445 million hold on Account 3 to $333,000, the precise amount traced to that account thus far.[3]

(2) The Government has requested that the total amount of actual funds frozen—across all accounts—not be allowed to exceed $1.445 million. Chase has confirmed its intent to comply with this request. The Restaurant Chain has been informed of this.

(3) The bolded accounts do not belong to the National Restaurant Chain. Account 4 belongs to Frazer Hockeyland, and Account 5 belongs to Mostafa Afr personally.

(4) The amount in Account 2 is $0.00 because funds frozen in that account—amounting to $67,344.93—were traceable to the $1.445 million, and Chase deposited those funds with the Marshals on April 10th pursuant to the Restraining Order, at the Government's request.

---

[3] The Government is still confirming the precise amounts traceable to Accounts 1 and 4.  The full $1.445 million was deposited in Account 2.

(5) The total amount of Restaurant Chain's actual funds restrained is **only $109,915.91** (Accounts 1-3 and 6-8 combined), or $177,260.84 if the original balance of Account 2 is included.

In sum, the work of tracking where the $1.445 million went continues.

### D. Restaurant Chain Changes Its Story, Again

On April 24th, counsel for Mostafa Afr provided a detailed accounting of the Restaurant Chain's spending to the Government, claiming that the restrained funds had been spent on a "first in, first out" basis. This account differs from the prior accounts provided to the Government, and to this Court. For example, the "cash trail" provided by the Restaurant Chain seems to implicitly disavow many of the 49 transactions that they provided at first.

Despite numerous requests, the Government still has no list of the "Equipment" that Restaurant Chain originally said the $1.445 million went to buy, which the Emergency Motion says is "The only property of Third Party subject to the Court's order." ECF 29 at PageID.124.

## Argument

## I.   No "Irreparable Harm" Claim, Maybe Due Process

The cases applying 21 U.S.C. § 853(k) to prohibit third-party challenges to pre-trial seizures and restraining orders are numerous. *Brown v. United States*, 692 F.3d 550, 552 (6th Cir. 2012); *United States v. Fabian*, 764 F.3d 636, 638 (6th Cir. 2014) ("'the sole avenue for a third party to assert an interest in forfeitable property' is a so-called 'ancillary proceeding' under § 853(n)") (quoting *United States v. Erpenbeck*, 682 F.3d 472, 480 (6th Cir. 2012) (emphasis omitted)); *Holy Land Foundation,* 493 F.3d at 476-77 (5th Cir. 2007); *United States v. Lazarenko*, 476 F.3d 642, 648 (9th Cir. 2007); *De Almeida v. United States*, 459 F.3d 377, 381 (2d Cir. 2006). Mostly they say that § 853(n) is the proper path, and an adequate remedy.[4] And the circuits also appear

---

[4] *United States v. Park*, 825 F. Supp. 2d 644, 647 (D. Md. 2011) (third parties cannot intervene in the criminal case to seek modification of a restraining order; their rights are protected by their ability to contest any forfeiture order in the ancillary proceeding); *Sunrise Acad. v. United States*, 791 F. Supp. 2d 200, 203, 206 (D.D.C. 2011) (absent showing of irreparable harm, § 853(k) bars a third party from commencing a separate action for the return of property seized pursuant to § 853(f); contrasting third party's desire for early resolution of its property interests with defendant's right to a hearing when his Sixth Amendment right to counsel is implicated); *United States v. O'Brien*, 836 F. Supp. 438, 442 (S.D. Ohio 1993) (third parties barred from opposing pretrial restraint by section 853(k)); *United States v. Bushay*, 2011 WL 3703863 (N.D. Ga. Aug. 22, 2011), affirming Report

11

unanimous in finding that third parties may never—outside of the 853(n) procedures—challenge the actual forfeitability of property. *See, e.g. United States v. Real Prop. in Waterboro*, 64 F.3d 752, 756 (1st Cir. 1995);

After all, the Supreme Court has held that upon a showing of probable cause and the Government's request, issuing a restraining order under § 853(e) to protect assets subject to forfeiture is mandatory, because a district court must act to prevent "the dissipation of the very property that § 853(a) requires be forfeited upon conviction." *United*

---

and Recommendation, 2011 WL 3704976, *3 (N.D. Ga. July 18, 2011) (§ 853(k) bars third party from filing a Rule 41(g) motion for the return of seized property based on alleged lack of probable cause); *United States v. Egan*, 2010 WL 3258085, *2 (S.D.N.Y. Aug. 16, 2010) (following *DeAlmeida*: § 853(k) bars a third party from challenging a pre-trial restraining order in a criminal case); *United States v. Kozeny*, 2011 WL 1672473, *5 (S.D.N.Y. April 29, 2011) (denying third party's motion for an immediate hearing on its challenge to a pre-trial restraining order; distinguishing *United States v. Regan*, 858 F.2d 115 (2nd Cir. 1988)); *United States v. Bundy*, 2008 WL 4133857, *2 (D. Md. 2008) (attorney asserting an attorney's lien on property subject to pre-trial restraining order must wait until the ancillary proceeding to contest the forfeiture as any other third party must do); *United States v. Hollis*, 2007 WL 1135515, *1 (S.D. Ga. 2007) (§ 853(k) bars third party from contesting seizure warrants and restraining orders pretrial; he must wait to contest the forfeiture in the ancillary proceeding pursuant to § 853(n)

*States v. Monsanto*, 491 U.S. 600, 612-13 (1989). That is just what the Court has done in this Restraining Order.

The caselaw contains no mention of "irreparable harm" as a basis for overturning Congress's ban on third-party intervention in 21 U.S.C. § 853(k). Even the cases that the Restaurant Chain cited for the proposition lack that phrase. *United States v. Holy Land Foundation for Relief & Development*, 493 F3d 469 (5th Cir. 2007); *Goldberg v. Kelly*, 397 US 254 (1970). However, at least one circuit has held that constitutional Due Process may overrule 853(k)—and allow a pre-forfeiture *third-party* challenge—applying the test from *Matthews v. Eldridge* to determine whether the third party has established that Due Process allows intervention. *United States v. Holy Land Found.*, 493 F.3d 469, 475 (5th Cir. 2007).

No Sixth Circuit case appears to adopt this view, apart from an unreported magistrate judge report and recommendation, subsequently adopted by the district judge, in a case cited in the Government's original

13

Opposition.[5]  Rather, the Sixth Circuit cases that considered these sorts of challenges have simply denied them pursuant to § 853(k).  *Brown v. United States*, 692 F.3d 550, 552 (6th Cir. 2012); *United States v. Fabian*, 764 F.3d 636, 638 (6th Cir. 2014)

## II.    This Situation Does Not Satisfy the *Eldridge* Factors

However, even if the Court chooses to apply the *Eldridge* factors as in *Holy Land Found.*, the Restaurant Chain cannot satisfy them.

That case sets out this test:

> In some cases … due process will require that the district court then promptly hold a hearing at which the property owner can contest the restraining order, without waiting until trial to do so.  To determine when such a hearing is required, we consider the three *Eldridge* factors: [1] the private interest that will be affected by the restraint; [2] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, [3] the Government's interest, including the burdens that the hearing would entail.

---

[5] *United States v. Bohn*, No. 02-20165 D/P, 2011 U.S. Dist. LEXIS 118539, at *21 (W.D. Tenn. June 27, 2011) (using a related *Barker v. Wingo* test to evaluate government delay).

**The Private Interest**

Here, the private interest amounts (1) funds seized from bank accounts, (2) temporary lost use of those accounts due to holds, and (3) the effects upon the Restaurant Chain's business. These are serious considerations. But the Chain's arguments exaggerate their harm by fundamentally failing to realize that the money restrained *is not theirs*. Rather, "All right, title, and interest in [the funds] vest[ed] in the United States upon the commission of the act giving rise to forfeiture." 21 U.S.C. § 853(c). That means that *before* Restaurant Chain deposited the funds, the United States' interest vested in them, when Mr. Kazkaz committed money laundering by creating the $1.445 million check (and before that when he deceived Medicare into sending him the funds). The funds that the Government has asked for holds on are directly traceable to $1.445 million that Defendant Kazkaz defrauded from Medicare. Fry Affidavit (attached) at ¶¶ 6-7.

Even if it later turns out that Restaurant Chain spent some of the restrained money and replaced it in the same accounts with identical money, that is no defense. 18 U.S.C. § 984 ("In any forfeiture action in

15

rem in which the subject property is . . . funds deposited in an account in a financial institution . . . it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property."

The actual amount frozen is less than 25% of the $1.445 million the Chain received three months ago. Over $200,000 actually belongs to Frazer Hockeyland or to Mostafa Afr personally, making the total amount of Restaurant Chain's actual funds restrained only $109,915.91 (Accounts 1-3 and 6-8 combined), or $177,260.84 if the original balance of Account 2 is included. Were they teetering on the brink of financial ruin before the Kazkaz influx of cash? Perhaps, but it seems unlikely. And it also strains credulity that the Restaurant Chain is as bad off as they claim, when they actively spent a $426K Check <u>after</u> they contended in the Emergency Motion that it was traceable to the $1.445 million. Fry Affidavit at ¶¶ 4-5; *see* ECF 29 at PageID. 117, 177-178.

Finally, it appears that the Restaurant Chain knows how to re-direct its cash flows and business model to non-frozen accounts. The amount frozen in what they describe as their main operating account

ending in 7885 has not increased—despite their claim that franchisees send revenues there—since the hold on April 7th.  Fry Affidavit at ¶ 8 (balance still $48,353.93).

In sum, the private interest appears serious, but exaggerated.

**Risk of Erroneous Deprivation, Likely Value of Safeguards**

On this factor, the Government clearly prevails.  The $1.445 million in Count 9 funds have been specifically named in the Superseding and Second Superseding Indictments, as subject to forfeiture.  They have been traced to the Restaurant Chain's accounts in specific numbers. Certainly, Mr. Kazkaz could be acquitted.[6]  But the grand jury has—at this point—found probable cause that Mr. Kazkaz will be convicted, and these funds forfeited.

Although the Chain can make bona-fide purchaser arguments, it is too early to speculate about that possibility.  This is an ongoing investigation.  But it makes little sense that the Restaurant Chain

_____

[6] And acquittal would not end or resolve a civil forfeiture case against the funds, in rem.

17

received these funds for "Equipment,"[7] and then (if today's brief is to be believed) immediately spent the funds on everything from payroll to utility bills. And the current primary defense – the money is all gone—is belied by the evidence tracing the funds to the relevant accounts, and to the $426K Check deposited on April 18th Fry Affidavit (attached) at ¶¶ 4-7.  The Government also intends to file a civil forfeiture case against these funds, in which "it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property." *See* 18 U.S.C. § 984.  This makes "erroneous deprivation" even less likely.

Consider the "safeguards" that the Restaurant Chain is seeking. They want the holds lifted *so they can spend the funds* –the very funds that 853(a) says are subject to forfeiture, and which 853(e) requires the Government to preserve for that purpose.  That is exactly what the Court must not do.  *Monsanto*, 491 U.S. 600, 612-13 (1989).  They also propose paying $10,000 a month to the Marshals (well and good) and preserving

---

[7] How could the Restaurant Chain even be a "purchaser" of these funds, if the funds were Mr. Kazkaz's funds that he gave them to purchase "Equipment" that Mr. Kazkaz was to own? It appears that the Restaurant Chain is a middleman who never owned the funds, under the contract.

the "Equipment."  While the Government is all for this latter course, to recoup restrained funds that cannot be recovered, the Restaurant Chain's complete inability to list the Equipment (or provide even a list of locations) is making the Government doubt than the Restaurant Chain even knows what the "Equipment" is.

No, the best solution would be to allow the Government to swiftly continue tracing the funds, deposit all traceable restrained funds with the Marshals, and then ask Chase to release the holds.

**The Government Interest**

Finally, it is worth noting that the Government risks irreparable harm if the restrained funds are spent.  If funds are placed beyond the reach of restraint or delivered to a party with bona-fide purchaser rights, the Government may *never* recoup those funds for Medicare.  In fact, that appears to be exactly what the Restaurant Chain plans to do with the currently frozen funds.  The Government interest here—in preventing fraud, preventing money laundering, protecting victims, and upholding the public interest—is exceedingly strong.

On balance, it makes no sense to allow the Restaurant Chain to spend funds traceable to the Count 9 funds in the Restraining Order.

## III.   In the Alternative, More Factual Evidence Requires Denial

Even if the Court finds that a hearing is required by Due Process, lifting these holds is not the proper way to help the Restaurant Chain.

In the original Opposition, the Government pointed out that the frozen accounts might hold restrained funds, and that a fact hearing would expose an ongoing criminal investigation to a detailed fact dispute. Those concerns remain true, except that the Government now *knows* that restrained funds are traceable to the restrained accounts, in the amounts listed above.  Fry Aff. ¶¶ 6-8. Furthermore, the Restaurant Chain *spent* restrained funds on April 18th, in violation of the Order, and has completely changed its story about where the money went.

These holds are necessary to prevent the Restaurant Chain from continuing to spend restrained funds.  Lifting the holds would have two bad effects, which are categorically antithetical to the goals of 21 U.S.C. § 853(a) and (e): (1) the Chain could spend the funds subject to forfeiture *currently* within the accounts, and (2) the Chain could circulate other

restrained funds from non-frozen accounts into the currently-frozen accounts, and spend those as well.  This is not what Congress had in mind.  *United States v. Monsanto*, 491 U.S. 600, 612-13 (1989) (the restraining order portion of the statute "cannot sensibly be construed to give the district court discretion to permit the dissipation of the very property that § 853(a) requires be forfeited upon conviction.")

The Restaurant Chain received $1.445 million in January 2023, from Mr. Kazkaz.  It has no right to continue running its business using these victim funds.  Instead, even if the Court is inclined to give some relief, the proper course would be to allow the Government enough time to complete its tracing work, deposit all restrained funds with the Marshals, and then lift the holds.

## Conclusion

The United States requests that the Court deny the Emergency Motion and allow the Restraining Order to remain in full force and effect until further order of this Court.

Respectfully submitted,

Dawn N. Ison
United States Attorney

21

*/s/K. Craig Welkener*
K. Craig Welkener (DC 1033585)
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-0248
Kenton.Welkener@usdoj.gov
Date: April 25, 2023