UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**UNITED STATES OF AMERICA**,

        Plaintiff,        No. 23-cr-20022-001

v.

        Hon. Gershwin A. Drain

**MOHAMED KAZKAZ**,

        Defendant.

_____/

**<u>SENTENCING MEMORANDUM IN SUPPORT
OF REQUEST FOR DOWNWARD VARIANCE
ON BEHALF OF DEFENDANT MOHAMED KAZKAZ</u>**

**Sentencing Date: October 26, 2023**

## I. INTRODUCTION

Mohamed Moayed Kazkaz was born in Hama, Syria in 1969, the seventh of ten children. He came to the United States lawfully when his sister, Suheir, was instrumental in bringing him, their mother, and another sister to the country. Suheir died during the pendency of this case of breast cancer at the age of 64. She is the wife of co-defendant Dr. Mustafa Abdul-Karim Hares. Mr. Kazkaz is not a medical professional and has received no medical training. Rather, he was educated in the United States as an engineer. He became a naturalized U.S. citizen during a ceremony held in the Theodore Levin U.S. Courthouse in 2002. *See* Presentence Report at ¶¶ 48-50.

Mohamed Kazkaz has been married to his wife, Naha, for thirty years. They have five children together, three of whom are minors, and all of whom reside with them. Mr. Kazkaz had no criminal history whatsoever prior to this case. He does not own or possess firearms, rarely travels, has multiple chronic health conditions, regularly attends religious services, contributes to his community and has a net worth of less than 10% of what he will be ordered to repay the government in this matter. *See* Presentence Report at ¶¶ 43-47, 51-57, 77.

At the earliest possible time, on July 18, 2023, Mohamed Kazkaz became the first, and so far, the only person to accept responsibility for the Medicare fraud that occurred here – well in advance of trial and without requiring the government or the

Court to expend any unnecessary resources to convict him. This was an excellent and encouraging first step towards full contrition, rehabilitation, and restitution that should be fully appreciated.

## II. SENTENCING STANDARD

The Supreme Court made clear in *United States v. Booker,* 543 U.S. 220, 245 (2005) that the Sentencing Guidelines are merely advisory. While every sentencing proceeding should begin with a correct calculation of the applicable sentencing guidelines range, this is only "the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007). "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate," the sentencing court must then consider all the factors under 18 U.S.C. § 3553(a) to determine whether they support a requested sentence. *Id.* at 49-50. In making this assessment, the court "may not presume that the Guidelines range is reasonable" but must make "an individualized assessment" for each unique person and case. *Id.* at 50. The ultimate sentence must "fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 488 (2011). As the Supreme Court has explained,

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

*Koon v. United States,* 518 U.S. 81, 113 (1996).

A sentencing court is completely "free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough v. United States,* 552 U.S. 85, 113 (2007). Section 3553(a), as interpreted repeatedly by the Supreme Court, gives the courts discretion to impose a sentence that substantially varies from the advisory guidelines range "based solely on policy considerations, including disagreements with the Guidelines." *Id.* at 101.

### III. ARRIVING AT THE LOWEST SUFFICIENT SENTENCE

Section 3553(a)'s overarching directive to sentencing courts is to "impose a sentence sufficient, but not greater than necessary" to achieve the goals of sentencing. *Kimbrough*, 552 U.S. at 101. These goals include: (1) "to reflect the seriousness of the offense," (2) "to promote respect for the law," (3) "to provide just punishment for the offense," (4) "to afford adequate deterrence to criminal conduct," and (5) "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2). In determining the lowest possible sentence that will achieve these goals, the Court should determine the sentencing guideline range and then proceed to consider all of the factors identified in section 3553(a).

A. The Sentencing Guideline Range

The probation department has calculated the sentencing guideline range to be 97 to 121 months imprisonment, based upon a total offense level of 30 and a criminal

history category of I.  Presentence Report ¶ 79.  Neither party has objected to the probation department's calculations.

B. Considering the § 3553(a) Factors

### 1. Nature and Characteristics of the Offense

Mr. Kazkaz pleaded guilty to one count of conspiracy to commit health care fraud and one count of money laundering in violation of 18 U.S.C. §§ 1347 and 1957 pursuant to a Rule 11 Plea Agreement.  These crimes each carry maximum terms of imprisonment of 10 years and up to three years' of supervised release.  As the owner/operator of a psychotherapy agency known as Centre HRW, he caused Medicare to be billed for approximately $11 million, of which Medicare paid approximately $5.3 million, for services that were either never rendered or not rendered as described in the billing.  He also paid kickbacks to patient recruiter Ziad Khalel for locating Medicare patients and also engaged in monetary transactions with the money unlawfully procured from Medicare.  Approximately $2 million of the $5.3 million has already been seized by the government, much of it listed in the plea agreement, and Mr. Kazkaz has agreed to forfeit the seized funds and to a money judgment in the full amount of the loss.  Mr. Kazkaz has also agreed with the government to jointly recommend a three-year term of supervised release, to execute all documents necessary to permanently exclude him from Medicare, Medicaid and

other federal health care programs, and to waive appeal of his conviction and sentence.

### 2.  History and Characteristics of the Defendant

At the age of 54, this is Mohamed Kazkaz's first and only encounter with the criminal justice system.  He has been married for 30 years and is the loving father of five children whose names and ages are contained in the Presentence Report at paragraph 51.  All the children reside with Mr. Kazkaz and his wife, Naha.  He spent the first 19 years of his life in the third world, and war ravaged, country of Syria.

### 3.  The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment

Mr. Kazkaz acknowledges that some term of imprisonment is necessary to reflect the seriousness of the offense, promote respect for the law and provide just punishment for his actions.

### 4.  The Need to Afford Adequate Deterrence and to Protect the Public from Further Crimes of the Defendant

This sentencing factor addresses whether Mohamed Kazkaz must be incarcerated for a significant period of time in order to prevent him from offending again and in order to protect the public from him in the future.  The answer to these questions is a resounding "no."  This conclusion is backed up by scientific research conducted by the United States Sentencing Commission.  In a 2017 publication by the Sentencing Commission entitled, *The Past Predicts the Future: Criminal History*

*and Recidivism of Federal Offenders* (2017) (attached hereto as Exhibit 1), the Commission addressed recent developments such as the size of the prison population and the cost of incarceration causing the Commission to refocus its interest on recidivism of federal offenders. The report focused on a statistical analysis of recidivism among 25,431 federal offenders released from prison or placed on probation.

Several key findings support the position that Mohamed Kazkaz is extremely unlikely to commit another crime, or even be arrested, in the future. First, the Sentencing Commission found that "[c]riminal history score and Criminal History Category (CHC) are strong predictors of recidivism." The higher the criminal history category the more likely the offender was to commit future crimes. In fact, "[e]ach additional criminal history point is generally associated with a greater likelihood of recidivism." Exhibit 1 at p. 14.

The second key finding by the Sentencing Commission supporting the conclusion that Mr. Kazkaz needs minimal deterrence from future criminality and that the public does not need Mr. Kazkaz to be incarcerated for a lengthy term of imprisonment to be secure from future crimes by him, is that there was a significant difference in recidivism rates among offenders just within Criminal History Category I. CHC I offenders are those with either zero or 1 criminal history point. Offenders with zero criminal history points had a 16.7% lower rearrest rate than

those with one criminal history point. Exhibit 1 at p. 6. Further, those offenders, like Mr. Kazkaz, "with zero criminal history points and *no prior contact with the criminal justice system* had an 11.7 percentage point lower recidivism rate than offenders with zero criminal history points and some prior contact with the criminal justice system, such as arrests or convictions that do not receive points." *Id.* (emphasis added).

Additionally, an earlier study by the Sentencing Commission entitled *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004) (attached hereto as Exhibit 2) published some additional recidivism details which support's the unlikelihood of Mr. Kazkaz committing crimes in the future. In a study of 28,519 federal offenders, the Commission concluded that offenders over 50 years of age were the least likely to commit future crimes at a rate of only 9.5%. Exhibit 2 at p. 12. For those 50 plus year olds with a criminal history category of I, the recidivism rate dropped to 6.2%. *Id.* at p. 28. For those with zero criminal history points, when recidivism was defined as a "re-conviction" of a new crime, the two-year recidivism rate was only 3.6%. *Id.* at p. 23. Those who are married are less likely to reoffend than those who have never been married or who are divorced. *Id.* at 12. Further, offenders who have a college degree were the least likely to commit new crimes as compared with lesser educational categories. *Id.* Mr. Kazkaz satisfies all of these positive statistical

8

criteria leading to the conclusion that he is extremely unlikely to commit new criminal offenses in the future.[1]

It is thus unsurprising that the Sentencing Commission recently passed Amendment 821, U.S. Sentencing Guideline § 4C1.1, which will grant an extra two-point reduction for certain offenders with zero criminal history points. This will reportedly be applied retroactively to zero-point offenders who have already been sentenced. Mr. Kazkaz's role in the offense enhancement would prevent him from technically qualifying for this reduction notwithstanding his negligible likelihood of committing future crimes.

Finally, any risk of Mr. Kazkaz committing a health care fraud offense in the future is further eliminated by the fact that he has agreed to execute all documents necessary to permanently exclude him from Medicare, Medicaid and other federal health care programs. Moreover, as the probation department has suggested, this Court could impose the following special condition of supervised release: "You may not be employed or volunteer in any capacity, or have any ownership interest in any

---

[1] The Sentencing Commission further concluded that there was "no apparent relationship between the sentencing guideline final offense level and recidivism risk. . . . The recidivism rates are essentially the same, regardless of the offender's offense severity under the sentencing table. This relationship is consistent with the principle that the guideline offense level is not designed to predict recidivism, while the criminal history computation is designed to predict recidivism." Exhibit 2 at p. 13.

entity, which involves billing any federal or private health care programs." Presence Report ¶ 101.

### 5. The Need to Provide the Defendant With Needed Educational Training, Medical Care or Other Correctional Treatment

Mohamed Kazkaz suffers from several chronic health conditions which require ongoing medical treatment including (1) systemic sclerosis with lung involvement which has decreased his lung capacity to 50%; (2) lumbar radiculopathy (sciatica); (3) painful fibromyalgia; (4) arthritis; and (5) obstructive sleep apnea. Presentence Report ¶¶ 56-57. These maladies require ongoing medical care and medications which could most appropriately be obtained outside of the prison system. Mr. Kazkaz does not have a history of mental health or substance abuse issues.

### 6. The Need to Avoid Sentence Disparities

The probation department has culled statistics from the U.S. Sentencing Commission regarding offenders sentenced within the past 5 years who were similarly situated as Mohamed Kazkaz:

> During the last five fiscal years (FY2018-2022), there were 131 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 30 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 130 defendants (99%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 72 months and the median length of imprisonment imposed was 72 months. For all 131 defendants in the cell, the average sentence

>imposed was 71 months and the median sentence imposed was 72 months.

Presentence Report ¶ 105. This is approximately two years below Mr. Kazkaz's advisory sentencing guideline range. It is likely that many of these defendants, unlike Mr. Kazkaz, (1) had one criminal history point, (2) had some prior contact with the criminal justice system, (3) were under the age of 50, (4) were unmarried, (5) had less than a college education, or had other factors known to increase the likelihood of committing future crimes and militating towards a lengthier sentence. Many of these individuals are also likely to receive a further sentencing reduction due to the retroactive application of Amendment 821, U.S. Sentencing Guideline § 4C1.1.

There are other anecdotal cases within the past few years involving defendants who, unlike Mohamed Kazkaz, were in trusted positions as physicians, had actual patient contact, unlawfully distributed controlled substances, were involved in significantly greater amounts of fraud and who, in some instances, failed to accept responsibility at all and had to be convicted at trial. Notwithstanding these aggravating facts, not present in this case, the following sentences at, near, or significantly below[2] Mr. Kazkaz's sentencing guideline range were issued:

1. Spilios Pappas, M.D., 63 (**convicted at trial** for conspiracy to commit health care fraud) sentenced on 3/9/22 to **9 years'** imprisonment and **$32,287,758** in restitution.

---

[2] *See* Exhibit 3 (press articles).

2. Tariq Omar, M.D., 63 (**convicted at trial** for conspiracy to commit health care fraud) sentenced on 3/9/22 to **8 years'** imprisonment and **$24,243,603** in restitution.

3. Joseph Betro, D.O., 60 (**convicted at trial** for conspiracy to commit health care fraud) sentenced in February 2022 to **9 years'** imprisonment and **$27,417,516** in restitution.

4. Mohammed Zahoor, M.D., 62 (**convicted at trial** for conspiracy to commit health care fraud) sentenced in February 2022 to **8 years'** imprisonment and **$36,645,577** in restitution.

5. Zahid Sheikh, M.D., 62 (**pleaded guilty** to conspiracy to commit health care fraud) sentenced in 2022 to **70 months'** imprisonment and **$2,088,797** in restitution.

6. Abdul Haq, M.D., 47 (**pleaded guilty** to conspiracy to commit health care fraud) sentenced in 2022 to **four years'** imprisonment and **$6,927,046** in restitution.

7. Steven Adamczyk, M.D., 47 (**pleaded guilty** to conspiracy to commit health care fraud) sentenced to **42 months'** imprisonment and **$1,237,570** in restitution.

8. David Weaver, M.D., 67 (**pleaded guilty** to conspiracy to commit health care fraud) sentenced in 2022 to **three years'** imprisonment and **$229,500** in restitution.

9. Glenn Saperstein, M.D., 58 (**pleaded guilty** to conspiracy to commit health care fraud) sentenced to **20 months'** imprisonment and **$2,722,760** in restitution.

10. David Yangouyian, M.D., 58 (**pleaded guilty** to conspiracy to commit health care fraud) sentenced to **six months** and **$35,480** in restitution.

11. Kashif Rasool, M.D., 46 (**pleaded guilty** to conspiracy to commit health care fraud) sentenced on January 30, 2023 to **32 months'** imprisonment and **$2 million** in restitution.

12. Vasso Godiali, M.D., (**pleaded guilty** to conspiracy to commit health care fraud) sentenced on 5/25/23 to **80 months'** imprisonment and **$19.5 million** in restitution.

The inescapable conclusion from an examination of (1) the Sentencing Commission's data from 130 cases over the past 5 years with similar criminal histories and similar offense levels as that of Mohamed Kazkaz and (2) sentences in this district within the past 2 years of physicians for significantly more egregious conduct combined, in some instances, with a complete failure to accept responsibility for their conduct, indicates that there is a need to vary from Mr. Kazkaz's sentencing guideline range to avoid unfair sentencing disparity. Specifically, Mr. Kazkaz should be sentenced within a range of **36 to 71 months** imprisonment followed by 3 years' supervised release and restitution in the amount of $5.3 million, minus amounts already seized by the government.

### 7. The Need to Provide Restitution

Finally, with respect to restitution, every year that Mohamed Kazkaz must spend in prison will cost the government $44,258. This cost drops to $35,761 in a community corrections center, and further still, to $4,454 per year that he is supervised by a probation officer. Presentence Report ¶ 91. At the same time, Mr. Kazkaz will not be able to make serious progress in fulfilling his restitution

obligations while in prison, as opposed to a CCC, home confinement, or supervised release. An unnecessarily long term of imprisonment will thus have a doubly negative financial consequence for the government and should be avoided for that reason among many others.

## IV. CONCLUSION

Wherefore, Mohamed Kazkaz asks this Honorable Court to issue the lowest possible custodial sentence that is "sufficient, but not greater than necessary" to punish and deter this 54-year-old immigrant from Syria, first time offender with no prior contact with the criminal justice system, husband, and father of five children, for committing a nonviolent fraud offense, in addition to (1) a crushing forfeiture judgment which will render him essentially penniless; (2) a permanent ban from the Medicare, Medicaid and other federal healthcare programs; and (3) a three year term of supervised release to this Court.

Respectfully submitted,

/s/ *Kenneth R. Chadwell*
Kenneth R. Chadwell
1361 E. Big Beaver Rd.
Troy, MI 48083
Phone: (313) 505-5866
kchadwell@manteselaw.com

Date: October 18, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2023, I electronically filed the foregoing document and exhibits, with the Clerk of the Court using the ECF system which sent notification of such filing to all attorneys of record. Further, the document and exhibits were emailed to the U.S. Probation Department.

/s/ *Kenneth R. Chadwell*
Kenneth R. Chadwell
1361 E. Big Beaver Rd.
Troy, MI 48083
Phone: (313) 505-5866
kchadwell@manteselaw.com